2010 UT 60

**Ryan McBRIDE, Petitioner and Appellant,**

v.

**UTAH STATE BAR, Respondent and Appellee.**

No. 20090818.

Supreme Court of Utah.

Nov. 2, 2010.

Ryan McBride, Provo, for petitioner.

Katherine A. Fox, Salt Lake City, for respondent.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Petitioner, Ryan McBride ("McBride"), seeks review of the Utah State Bar's (the "Bar") final decision disqualifying him from the Bar Exam (the "Exam") for failure to upload his typed essay exam answers within the required time frame. Mr. McBride's petition raises five issues. Mr. McBride claims that the Bar acted unconstitutionally, denying him procedural due process, substantive due process, and equal protection of the law. Mr. McBride also claims that the Bar applied the incorrect rule to his situation, and finally that the Bar examiners enforced an unreasonable rule.

¶ 2 Mr. McBride petitions this court to waive the examination requirement and admit him to the Utah State Bar or to compel

the Bar to grade his completed essay questions and admit him if his answers to those questions are passing. Mr. McBride also requests that this court direct the Bar to correct its rule and remedy its effect on Mr. McBride. We hold that the Bar's actions were constitutional and we deny Mr. McBride the relief he seeks.

## FACTUAL BACKGROUND

¶ 3 The Bar administered the Exam on July 28 and 29, 2009. The first day of the Exam consisted of an essay portion and the second day consisted of a multiple choice portion. On the essay portion, bar examinees have the option to handwrite their answers or type them with the use of a laptop computer. Examinees who used a computer during the July 2009 Exam were required to use a computer program, SofTest, which allows examinees to upload their essay answers to the SofTest server. The Bar first allowed examinees to take their essay exams with SofTest in 2002. Initially, examinees used floppy disks to transfer their answers. Over time, floppy disks were replaced by use of the Internet for uploading answers. In 2007, the Bar moved its testing location and determined that it would be prohibitively expensive to provide sufficient wireless Internet capacity for all examinees to upload their answers at the test site. As a result, examinees are responsible for locating Internet access and uploading their answers within a specified time following the exam.

¶ 4 Examinees who elect to type their essay answers with a computer must request to do so in advance and sign an "Acknowledgment of Participation in Laptop Program" form. The acknowledgment form states, "I agree to upload my answers.... I further understand that a failure to upload all of my answer files by 10:00 p.m. on the day the written portion of the Bar examination is administered may result in the disqualification of my answers." The Bar selected the 10:00 p.m. mountain time deadline because technical support for SofTest is available only until that time.

¶ 5 Mr. McBride chose to use a laptop for the July 2009 Exam. He notified the Bar of his decision by signing the acknowledgment form. Mr. McBride completed the essay portion of his exam using his computer on July 28, 2009. That evening, Mr. McBride failed to upload his answers. Mr. McBride left the test site, joined his wife at a restaurant, and went home without turning on his computer or uploading his answers.

¶ 6 After arriving at the testing center for the second day of the Exam, an exam proctor asked Mr. McBride if he had uploaded his answers. Mr. McBride realized that he had not, and responded accordingly. The proctor informed Mr. McBride that he would not be allowed to take the multiple choice portion of the Exam.

¶ 7 The record in this case establishes that Mr. McBride had received seven separate notifications that the deadline to upload Exam answers was 10:00 p.m. on July 28, 2009, and that failure to upload his Exam answers could result in their disqualification. The Bar gave three of these notifications to Mr. McBride in written form prior to the Exam date. First, the Bar provided a "Laptop Use Information" handout prior to computer registration that stated, *"[t]o use a laptop for the essay examination you must* ... [a]gree to upload your answer file (files) by the deadline. The deadline for uploading your answer file is *10:00 p.m.* on July 28, 2009. Failure to upload your answer file can result in being disqualified and removed from the exam." Second, Mr. McBride signed the "Acknowledgment of Participation in Laptop Program" form, in which he agreed to upload his answers by 10:00 p.m. on the day of the written portion of the Exam. Third, the Bar sent Mr. McBride a "Flexsite Exam Information" document confirming his laptop registration. The first page of that document advises, "[y]ou are *required* to upload your answers by the deadline listed below." Then, in bold, red print, the document reads: *"EXAM UPLOAD DEADLINE: 10:00 p.m. MST, Tuesday, July 28th. Failure to do so can result in being disqualified from the exam."*

¶ 8 Mr. McBride also received four other notifications of the deadline and the consequences of the failure to meet it. The Deputy General Counsel in Charge of Admissions

(the "Deputy") read a set of instructions aloud before the start of the first day of the Exam. These instructions reminded applicants that "you are required to upload your answers by 10:00 p.m. tonight. You should upload your answers as soon as possible after you are excused from the exam this afternoon." The instructions further warned examinees that they should not go home or go to their hotel room and fall asleep, as some applicants had done in the past. The Deputy cautioned that those applicants were "disqualified because they did not upload their answers by the deadline." She further stressed, "if you do not upload your answers tonight, you will not be allowed to sit for the second day of the exam." After the Deputy read these instructions, she gave examinees the chance to handwrite their answers if they thought uploading their answers would be a problem.

¶ 9 At the end of the first exam day, proctors read another set of oral instructions that reminded computer examinees to upload their answers as soon as possible, but no later than 10:00 p.m. that evening. The oral instructions also advised examinees to upload their answers as early as possible so they could call technical support if they encountered any problems. At the end of these instructions, the proctors told examinees, "[y]ou will not be allowed to sit for the second day of the exam, if our records indicate that you have not at least attempted to download [sic] your answers this evening."

¶ 10 The proctors gave another oral warning at the end of the first day while they distributed a document entitled, "Uploading Your Answer File Instructions." The written instructions clearly stated:

> Your answer file must be uploaded by 10:00 p.m. TODAY, Tuesday, July 28th .... If you attempt to upload your answers but are not able to do so because of technical problems, you will be permitted to upload your answers after the deadline. If, however, you fail to upload your answers by the deadline and there is no record that you attempted to do so, your answers will not be graded and you will be dismissed from the exam.

In summary, Mr. McBride received seven separate notices informing him that failure to upload his answers could result in his disqualification. A total of 243 examinees chose to take the July 2009 Exam with a laptop. Only two failed to upload their answers.

## PROCEDURAL BACKGROUND

¶ 11 On August 10, 2009, Mr. McBride filed a Request for Review with the Bar regarding his disqualification. The Admissions Committee considered Mr. McBride's Request for Review under rule 14–709 of the Rules Governing the Utah State Bar ("RGB") and denied the request on September 18, 2009. On September 21, 2009, the Committee received a Supplemental Request for Review from Mr. McBride urging the Bar to apply rule 14–715 rather than rule 14–709. On September 28, 2009, the Committee revisited Mr. McBride's request and upheld Mr. McBride's disqualification under rule 14–715. In October 2009, Mr. McBride filed a Petition for Review in this Court. During the time this case has been under advisement, Mr. McBride sat for the Exam again, passed, and has been admitted to the Bar. But neither party has filed a "suggestion of mootness" as required by rule 37 of the Utah Rules of Appellate Procedure.

## STANDARD OF REVIEW

¶ 12 "Under article VIII, section 4 of the Utah Constitution, this court is empowered to govern the practice of law in Utah, including the admission to practice." *In re Arnovick*, 2002 UT 71, ¶ 5, 52 P.3d 1246. Our review of Bar Commissioner Board decisions is unique "[b]ecause the Board of Bar Commissioners acts as [this court's] agent." *Id.* As such, "[w]e may exercise judgment independent of the Bar Commission whenever we deem it appropriate." *Id.* "[W]e review the actions of the Bar and the Bar examination process to determine if they clearly demonstrate that the petitioners have been treated in an unfair, unreasonable, or arbitrary manner." *Id.* However, "[w]e have generally chosen ... to 'indulge some deference to [the Bar's] findings and judgments,' and have stated that 'the Court should not disturb what the Commission has done unless the petitioner *clearly*

*demonstrates* that he has been treated in an unfair, unreasonable or arbitrary manner.'" *Id.* (emphasis added) (quoting *In re Thorne*, 635 P.2d 22, 23 (Utah 1981)).

## ANALYSIS

### I. ALTHOUGH MOOT, WE ADDRESS THE ISSUES MR. MCBRIDE RAISES UNDER THE PUBLIC INTEREST EXCEPTION TO THE MOOTNESS DOCTRINE

¶ 13 Although neither party has filed a suggestion of mootness, we exercise our discretion to address mootness sua sponte.[1] "Ordinarily we will not adjudicate issues when the underlying case is moot." *Ellis v. Swensen*, 2000 UT 101, ¶ 25, 16 P.3d 1233. An issue is moot "'when the requested judicial relief cannot affect the rights of the litigants.'" *Id.* (quoting *Burkett v. Schwendiman*, 773 P.2d 42, 44 (Utah 1989)). We will on occasion, however, exercise our discretion and address a moot issue if we find that it "falls within the 'public interest exception' to the mootness doctrine." *Id.* A matter falls within the public interest exception "when the case presents an issue that affects the public interest, is likely to recur, and because of the brief time that any one litigant is affected, is capable of evading review." *Burkett*, 773 P.2d at 44.

¶ 14 The issues Mr. McBride presents are moot. Mr. McBride has retaken and passed the Exam. Additionally, he has been admitted to the Bar. Because any determination we make will not affect Mr. McBride's admittance to the Bar, his request that we order his admittance to the Bar is moot.

¶ 15 We nevertheless address the issues raised by Mr. McBride under the public interest exception to the mootness doctrine because they are matters of public importance that are capable of repetition and otherwise likely to evade review. First, because this court is constitutionally obligated to oversee the Bar's admissions process, the constitutionality and reasonableness of these procedures are matters of public importance. *See* Utah Const. art. VIII, § 4; *see also Ellis*, 2000 UT 101, ¶ 27, 16 P.3d 1233 (noting that "courts frequently retain jurisdiction" under the public interest exception in cases involving "class actions, questions of constitutional interpretation, issues as to the validity or construction of a statute, or the propriety of administrative rulings." (internal quotation marks and emphasis omitted)). Second, the issues are capable of repetition every time the Exam is administered. Finally, the issues are likely to evade review. The Exam is offered every six months. Because it is highly unlikely, if not impossible, that a claim such as this could be litigated from start to finish in a six month period of time, an aggrieved applicant could retake the Exam and be admitted to the Bar before the issue could be litigated. We therefore exercise our discretion to address the issues raised by Mr. McBride.

### II. THE BAR PROVIDED MR. MCBRIDE ADEQUATE PROCEDURAL DUE PROCESS

¶ 16 We first consider Mr. McBride's argument that the Bar deprived him of procedural due process. Procedural due process requires, "[a]t a minimum, 'timely and adequate notice and an opportunity to be heard in a meaningful way.'" *In re Worthen*, 926 P.2d 853, 876 (Utah 1996) (quoting *Nelson v. Jacobsen*, 669 P.2d 1207, 1211 (Utah 1983)). Despite this,

> due process is not a technical concept that can be reduced to a formula with a fixed content unrelated to time, place, and circumstances. Rather, the demands of due process rest on the concept of basic fairness of procedure and demand a procedure

---

1. In this case, we are independently aware that Mr. McBride has been admitted to the Bar and therefore we exercise our discretion to address the mootness issue sua sponte. But we reiterate that it is the *parties' obligation* to "inform the court of any circumstances which have transpired subsequent to the filing of the appeal ...

which render moot one or more of the issues raised." Utah R.App. P. 37; *see also Salt Lake Cnty. v. Holliday Water Co.*, 2010 UT 45, ¶ 21, 234 P.3d 1105 ("The burden of persuading the court that an issue is moot lies with the party asserting mootness." (internal quotation marks omitted)).

appropriate to the case and just to the parties involved.

*Id.* at 877 (internal quotation marks omitted). Mr. McBride's procedural due process claim fails because we conclude that the Bar provided him with sufficient notice and an adequate hearing.

### A. The Notice Requirement Is Satisfied

■ ¶ 17 The Bar's seven separate notices gave Mr. McBride adequate notice of the consequences of failing to upload his answers. Under the due process notice requirement, "[t]he notice must be of such nature as reasonably to convey the required information." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see also Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 601–02 (Utah 1980) ("Under the due process clause, [a] plaintiff [is] entitled to have ... essential information imparted to him....") Mr. McBride claims the notices were insufficient. Specifically, he argues that he should only be held accountable for the signed "Acknowledgment of Participation in Laptop" form and that this form indicated only that failure to upload his answers "may" result in their disqualification, rather than indicating that failure to upload would automatically result in disqualification.[2] We are not persuaded.

¶ 18 The use of the permissive verb "may" meets the notice requirement since it "reasonably ... convey[s] the required information." *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. The notices adequately warned Mr. McBride that if he failed to upload his answers within the designated time frame the Bar may not accept them. And the Bar's use of the term "may" was accurate because the Bar does not penalize examinees who attempt to, but cannot successfully, upload their answers for technical reasons. This procedure accounts for fair handling of technical difficulties while still providing notice of potential disqualification to those examinees who make no effort to upload their answers. In short, the notice needed only to inform examinees that they may be expelled from the Exam if they failed to follow certain procedures and the notices given to Mr. McBride did just that. The oral instructions further clarified that an examinee who failed to successfully upload his or her exam answers would be allowed to sit for the second Exam day only if the examinee had attempted to upload his or her answers but was unsuccessful due to technical difficulties. We conclude that any one of the seven notices given to Mr. McBride was sufficient to satisfy the notice prong of procedural due process.

### B. Mr. McBride Received an Adequate Hearing

■ ¶ 19 A pre-deprivation evidentiary hearing is not a requirement, nor is it always the most effective decisionmaking method. *See Mathews v. Eldridge*, 424 U.S. 319, 340, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("Only in *Goldberg* has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation."); *see also Tyler v. Vickery*, 517 F.2d 1089, 1103 (5th Cir.1975) ("While the opportunity to be heard is generally considered a fundamental component of due process, entitlement to a hearing does not automatically flow from a finding that procedural due process is applicable."). Instead, the type of hearing required by due process depends on:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

---

**2.** Mr. McBride argues that under *Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926), the term "may" indicates discretion and that discretion can only be exercised "after [a] fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Id.* at 123, 46 S.Ct. 215. In *Goldsmith*, the United States Supreme Court determined that Goldsmith, an individual who had been denied a tax license based upon charges of unfitness, was "entitled to demand from the Board the right to be heard on the charges against him." *Id.* But Goldsmith had not demanded a hearing and the court held that "[u]ntil [Goldsmith] had sought a hearing from the board, and been denied it, he could not appeal to the courts for any remedy and certainly not for mandamus to compel enrollment." *Id. Goldsmith* is inapposite here because Mr. McBride has requested and received several opportunities to be heard.

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*In re Arnovick,* 2002 UT 71, ¶ 16, 52 P.3d 1246 (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893).

¶ 20 The United States Supreme Court has made clear that " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In *Mathews,* the Supreme Court applied three factors in determining that due process did not require an evidentiary hearing before terminating an individual's disability benefits. *Id.* at 339–50, 96 S.Ct. 893. The Court ultimately denied Mathews' due process claim because (1) Mathews' private interest was low, (2) the risk of erroneous deprivation of the interest and the probable value of procedural safeguards was low, and (3) the government interest in conserving scarce fiscal and administrative resources was high. *Id.* Similarly, procedural due process has been met here where (1) Mr. McBride's private interest is low, (2) the risk of erroneous deprivation and the probable value of procedural safeguards is low, and (3) the Bar's interest in administrative efficiency is high.

### 1. Mr. McBride's Private Interest Is Low

¶ 21 While Mr. McBride's interest in taking the Exam may be great, it is not so great as to require that he be given a full hearing prior to disqualification from the Exam. A bar applicant may have an interest in taking the Exam, but an individual does not have an absolute right to practice law. *See Schware v. Bd. of Bar Exam'rs,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (noting that while "[a] State cannot exclude a person from the practice of law ... for reasons that contravene the Due Process or Equal Protection Clause ... [a] State can require high standards of qualification, such as good moral character or proficiency in its law").

¶ 22 In *Arnovick,* this court applied the *Mathews* factors in a challenge to a Bar decision denying admission to applicants who failed the Exam after a faulty torts question was thrown out of the grading scale. *In re Arnovick,* 2002 UT 71, ¶¶ 2–3, 16, 52 P.3d 1246. We determined the bar applicants' interest did not satisfy the first *Mathews* factor since "the Bar's decision [did] not permanently deny [them] the ability to practice law in Utah; they [could] retake the examination until they pass[ed] it." *Id.* ¶ 16. The Tenth Circuit Court of Appeals reached a similar conclusion in a bar challenge case, holding that "[t]he interest of the unsuccessful bar examinee pales by comparison with the interest of the welfare recipient, or even the disability benefits recipient who was found not to deserve a pre-termination hearing in *Mathews.*" *Lucero v. Ogden,* 718 F.2d 355, 357 (10th Cir.1983).

¶ 23 Here too, Mr. McBride's interest is not so great that it required a full hearing prior to his disqualification from the Exam. Mr. McBride was not permanently denied the ability to practice law in Utah but could retake the Exam and follow the Exam procedures. And, as was the case in *Lucero,* Mr. McBride's interest in taking the Exam pales in comparison with the interests of a welfare recipient or a disability benefits recipient. Moreover, unlike the disability benefits recipient in *Mathews,* Mr. McBride has no pre-existing benefit to deny since he did not have a professional license to lose. *See Lander v. Indus. Comm'n,* 894 P.2d 552, 555 (Utah Ct.App.1995) (determining that an individual applying for workers' compensation claims did not have a private interest under *Mathews* since "[t]hese are not benefits to which [the plaintiff] has already been deemed entitled, but ones he hopes to receive"). Thus, Mr. McBride's interest is low and did not require a full hearing prior to his disqualification.

### 2. The Risk of Erroneous Deprivation and the Probable Value of Procedural Safeguards Is Relatively Low

¶ 24 When examining the second *Mathews* factor, courts have evaluated the adequacy of the grievance procedures in determining the

presence of an erroneous deprivation. *See In re Arnovick*, 2002 UT 71, ¶ 16, 52 P.3d 1246. In *Arnovick*, we held that the second *Mathews* factor was met where "petitioners [had] received the benefit of an extensive review process culminating in their appearance before this court." *Id.* There, the extensive review process included: "(1) the filing of their complaint, (2) the review of their complaint by the Admissions Committee . . ., (3) the petitioners' written response to those findings and recommendations, (4) an oral hearing, and (5) a review and formal findings by the Executive Committee of the Bar." *Id.* ¶ 10. We reasoned that, "[g]iven the extensive nature of this review process, the risk of error in the Bar's decision seems to us to be small and the probable value of additional procedural safeguards would be minimal." *Id.* ¶ 16. In *Lucero*, the Tenth Circuit similarly determined that there is a low risk of erroneous deprivation where "there is no evidence that the procedures are unfair, e.g. that the graders engaged in insidious discrimination." *Lucero*, 718 F.2d at 358.

¶ 25 Here, there is a relatively low risk of erroneous deprivation since Mr. McBride has made use of the extensive grievance procedures available to him. Much like the petitioners in *Arnovick*, Mr. McBride has "received the benefit of an extensive review process culminating in [his] appearance before this court." *In re Arnovick*, 2002 UT 71, ¶ 16, 52 P.3d 1246. This process has included (1) his initial discussion with the proctors at the Exam, (2) the filing of his request for review with the Bar, (3) the review of his request by the Admissions Committee of the Bar by a three-member panel, (4) the filing of his Supplemental Memorandum with the Committee, (5) the Committee's review and supplemental decision, and finally, (6) this appeal. As in *Arnovick*, "the risk of error in the Bar's decision seems . . . to be small and the probable value of additional procedural safeguards would be minimal." *Id.* Furthermore, there is no evidence that the available procedures were unfair to Mr. McBride or that the Exam proctors engaged in "insidious discrimination." *Lucero*, 718 F.2d at 358. The Exam proctors properly applied the standard test-taking procedures to Mr. McBride. Mr. McBride was not singled out or treated unfairly in comparison with other examinees. Mr. McBride simply failed to comply with the standard test-taking procedures.

¶ 26 Moreover, the Bar's use of the permissive verb "may" in its computer contract demonstrates that there are already reasonable procedures in place to prevent erroneous deprivation. If an examinee fails to upload his or her exam because of technical difficulties, rather than simple forgetfulness, the Bar allows the examinee to sit for the second day of the Exam while technicians determine if the examinee attempted to upload the answers the night before. This process ensures that an examinee who tries to follow the Exam procedures, but cannot upload his or her answers for a technical reason, is not unfairly disqualified from taking the second day of the Exam. Indeed, it would be "curious logic to condemn the examiners for utilizing practices designed to recognize the inherent limitations of testing and for attempting to give the benefit of the doubt to applicants who may have been adversely affected by those limitations." *Tyler*, 517 F.2d at 1103.

¶ 27 In sum, the risk of erroneous deprivation and the probable value of additional safeguards is relatively low since there is an extensive review process, no unfair treatment, and the Bar's current procedures help prevent erroneous deprivation.

3. The Bar's Interest in Reducing Administrative Burdens Is High

¶ 28 Courts have found that governmental interests, including the fiscal and administrative burdens caused by additional procedures, can outweigh the other *Mathews* factors. *See In re Arnovick*, 2002 UT 71, ¶ 16, 52 P.3d 1246 (noting that "the fiscal and administrative costs of imposing any additional procedures on the Bar outweigh the benefit that such procedures could provide, especially given the ever-increasing number of Bar applicants"); *see also Lucero*, 718 F.2d at 358 (holding that the requirement of a full evidentiary hearing every time a bar applicant fails the bar "would place an intol-

erable burden upon the Board" (internal quotation marks omitted)).

¶ 29 In this case, the administrative burden of providing a pre-disqualification hearing to every examinee who failed to abide by testing protocol would be significant. Even assuming that the hearing would not have to be a formal proceeding, waiting for technicians to determine whether answers had been altered could take tremendous time, especially if more than one student failed to abide by the testing procedures. The Bar's strong interest in the efficient administration of the Exam outweighs Mr. McBride's private interest and the low risk of erroneous deprivation. In short, we conclude that Mr. McBride's procedural due process rights did not require the Bar to provide Mr. McBride with a full hearing prior to his disqualification.

### III. THE BAR'S PROCEDURES SATISFY SUBSTANTIVE DUE PROCESS

¶ 30 Mr. McBride also raises a substantive due process claim. The Due Process Clause "allows states to substantively regulate economic rights if such regulation bears a rational relation" to a legitimate government objective. *In re Arnovick*, 2002 UT 71, ¶ 15, 52 P.3d 1246. Mr. McBride relies on *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), arguing that the Bar's 10:00 p.m. deadline for uploading his exam answers denied him substantive due process because it was not rationally related to the Bar's interest in determining his fitness or ability to practice law. In so arguing, Mr. McBride misconstrues the nature of the Bar's interest.

¶ 31 In *Schware*, the U.S. Supreme Court determined that the Bar could not disqualify an applicant due to his past membership in the Communist Party since his prior party membership had no rational relation to the legitimate government objective in ensuring that licensed attorneys have good moral character and proficiency in the law. *Id.* at 246, 77 S.Ct. 752. But unlike *Schware*, Mr. McBride was not disqualified from the Exam for a lack of fitness or competency. Rather, he was disqualified because he failed to com-

ply with the requirements imposed by the Bar as part of its effort to efficiently administer the Exam. To ensure the efficient administration of the Exam, the Bar must establish reasonable deadlines for receipt of bar applications, background check completion, and the uploading of exam answers. It would be intolerably burdensome to force the Bar to accept every application, background check, and set of exam answers submitted after the established deadlines. Basic procedural requirements, including deadlines, are necessary and rationally related to the Bar's legitimate interest in the efficient administration of the Exam.

¶ 32 Furthermore, the Bar has a legitimate interest in preventing cheating and in assuring there is technical support available during the upload time frame. These interests are satisfied by the 10:00 p.m. deadline since it reduces the window for cheating and since technical support is only available until 10:00 p.m. mountain time. Thus, the 10:00 p.m. deadline is not arbitrary but bears a rational relationship to the legitimate objective of the Bar in administering an efficient exam. We therefore conclude that Mr. McBride has not been denied substantive due process.

### IV. THE BAR DID NOT DENY MR. MCBRIDE EQUAL PROTECTION

¶ 33 Mr. McBride next claims that the Bar denied him equal protection when it required laptop examinees to submit their answers after leaving the testing center, while it allowed examinees who handwrote their exams to turn in their answers immediately. Mr. McBride contends that he was tested for "obedience" or "memory," whereas examinees who handwrote their answers were not. We are unpersuaded by Mr. McBride's equal protection claim. When no suspect class or fundamental right is involved, "states may treat similarly situated people differently if a reasonable basis exists for doing so." *In re Arnovick*, 2002 UT 71, ¶ 14, 52 P.3d 1246. And in this case, the Bar had a rational basis for treating laptop examinees differently from those writing by hand.

¶ 34 There are several rational reasons for treating computer examinees differently. First, it is logical to require that those hand-

writing their answers be required to submit them prior to leaving the exam room. In fact, there is no conceivable reason for allowing examinees to remove the "blue books" containing examinees' answers from the exam room. But there was a legitimate reason for not requiring that examinees be required to upload their answers before leaving. As the Bar notes, "[t]he opportunity for subsequent alterations to [handwritten] blue-book answers is extremely high, modifications are easy to accomplish, and detection and proof of changes may be virtually impossible." Internet connectivity was not available at the testing center on the wide scale that would have been necessary for so many applicants to upload their answers at once. Moreover, the cost to provide such Internet connectivity on-site would have been extremely high. And the testing software utilized by the Bar made it more difficult for examinees to change their answers after leaving the exam. Thus, the Bar reasonably concluded that the risk associated with a short delay in uploading answers was acceptable. Therefore, while the requirement that examinees upload their answers by the deadline may have been an inconvenience to examinees, it was not a violation of equal protection.

## V. THE BAR ACTED REASONABLY IN ITS APPLICATION OF THE RULES GOVERNING THE UTAH STATE BAR

¶ 35 Mr. McBride next argues that the Bar acted in an unfair, unreasonable, and arbitrary manner when it applied rule 14–709 of the Rules Governing the Utah State Bar ("RGB") to his case. In denying Mr. McBride's Request for Review, the Bar relied on rule 14–709 [3] of the RGB. Mr. McBride contends that the Bar should have applied rule 14–715 [4] rather than rule 14–709 because, according to Mr. McBride, rule 14–709 deals with "incomplete applications," while rule 14–715 addresses review of Bar Exam failure, including failure "because of a substantial irregularity in the administration of the examination that resulted in manifest unfairness." Utah Sup.Ct. R. Prof'l Practice 14–715(b).

¶ 36 We are unpersuaded. While the language of rule 14–709 could be clearer, it is not limited to "incomplete applications" as Mr. McBride argues. The Bar's practice is to apply rule 14–715 solely to applicants who take and fail the Bar Exam and to apply rule 14–709 to applicants who are disqualified from the examination for reasons other than a failing score.[5]

¶ 37 Moreover, we have given the Bar substantial flexibility in interpreting its rules. In *In re Arnovick*, this court noted:

> Obviously, as the arm of this court, the Bar must do its utmost to adhere to the rules, policies, and procedures that we have approved for their governance. When deviations from these rules, policies, and procedures occur, it is expected that the Bar will take whatever steps are neces-

**3.** Rule 14–709(a) of the RGB states, "Notice from Bar. An applicant whose application is denied because he or she does not meet the qualifications for admission under this article will receive written notice from the Bar that his or her application has been denied, along with a statement explaining the deficiency and reason(s) for denial." Utah Sup.Ct. R. Prof'l Practice 14–709(a).

**4.** Rule 14–715(b) of the RGB states,

> Standard of review. The Board or its designees shall only review the request of failing applicants who claim that failure was because of a substantial irregularity in the administration of the examination that resulted in manifest unfairness or because of mathematical errors in the scoring of the applicant's examination. A substantial irregularity in the administration of the examination will not be a matter that will result in questions or answers being reread, reevaluated or regraded. The Board and its designees shall not reread, reevaluate or regrade Bar Examination answers.
>
> *Id.* 14–715(b).

**5.** In its brief, the Bar provides several examples that would fall under rule 14–709:

> For example, an applicant would be disqualified for non-payment of initial licensing fees which are due after passing the Bar Exam but shortly before the admissions ceremony. An applicant may also be disqualified for failure to take and pass the Multi–State Professional Responsibility [Exam] for up to two years after taking and passing the Bar Exam. Or, an applicant may be disqualified for cheating or even attempting to cheat which could be discovered before, during, or even after the Bar Exam.

sary to insure that such deviations do not occur again in future examinations. However, *lapse from strict compliance with the rules and procedures,* while certainly a cause for concern on our part, *does not automatically mean that the Bar has acted in an arbitrary or unfair manner.*

2002 UT 71, ¶ 12, 52 P.3d 1246 (emphasis added). Given this court's inclination to "indulg[e] some deference to [the Bar's] findings and judgments," *In re Thorne,* 635 P.2d 22, 23 (Utah 1981), it was not unreasonable for the Bar to have applied rule 14–709 in this case.

## VI. THE BAR'S PROCEDURES ARE REASONABLE

¶ 38 Mr. McBride also argues that the Bar's procedures were unreasonable. "[W]e review the actions of the Bar and the Bar examination process to determine if they *clearly* demonstrate that the petitioner[ ] [has] been treated in an unfair, unreasonable, or arbitrary manner." *In re Arnovick,* 2002 UT 71, ¶ 5, 52 P.3d 1246 (emphasis added). Thus, in order to prevail, Mr. McBride must clearly demonstrate unfairness. *See In re Randolph–Seng,* 669 P.2d 400, 401 (Utah 1983) ("Relief is granted [to an unsuccessful bar examinee] only where he can prove arbitrary or capricious conduct on the part of the Bar Examiners or in the administration of the examination, or show that extraordinary circumstances of his case require his passage to prevent manifest injustice. Under either posture the burden of proof is on the petitioner." (citation omitted)).

¶ 39 In arguing that the Bar Examiners enforced an unreasonable rule in disqualifying him from the second day of the Exam, Mr. McBride relies on the following: (1) the lack of notice, (2) the allegedly arbitrary 10:00 p.m. deadline, (3) his disqualification without any evidence of wrongdoing, (4) the lack of a remedy now that his answers have been disqualified, (5) the fact that alternative methods of submitting answers were easily feasible, (6) the allegation that the sanction imposed by the Bar was extreme, unfair, and draconian, and (7) the fact that the purpose of the Bar favors a more accommodating rule. We have previously addressed several of these claims. We have concluded that the Bar provided Mr. McBride with adequate notice by informing him on seven separate occasions about the repercussions of failing to upload his exam answers within the required time frame. And we have also concluded that the 10:00 p.m. deadline was rationally related to the Bar's legitimate interest in conducting an efficient exam.

¶ 40 We find the remainder of Mr. McBride's claims equally unpersuasive. With respect to Mr. McBride's third claim, cheating or wrongdoing are not the only reasons for which the Bar can disqualify an applicant from sitting for the Exam. For instance, an applicant who fails to meet the deadline for a background check or fails to submit his or her exam fees will similarly be disqualified even though there is no evidence that he or she engaged in wrongdoing or had any intent to cheat.

¶ 41 Mr. McBride's fourth argument, that the rule the Bar applied to him precludes a remedy, also fails. Mr. McBride's own use of the exhaustive administrative and judicial remedies available to him demonstrate that a remedy was, in fact, available. Any applicant who believes that he or she was wrongly disqualified from sitting for the Bar can appeal that decision through the proper administrative channels and can ultimately appeal to this court. *See* Utah Sup.Ct. R. Prof'l Practice 14–709(b)–(c). Moreover, nothing precluded Mr. McBride from taking the Exam at another date, which he did.

¶ 42 Mr. McBride also argues that there were feasible alternatives to the Bar's requirement that examinees upload their own exam answers, including on-site Internet access or the use of USB drives to upload answers. But this "feasible alternative" argument improperly assumes that the Bar's methods and procedures must not only be reasonable, but also the most convenient for examinees. Merely showing that the Bar's examination methods are less convenient than alternative methods does not satisfy Mr. McBride's burden of demonstrating that he has been treated in an unfair, unreasonable, or arbitrary manner.

¶ 43 Mr. McBride's sixth claim is that the punishment here was draconian and disproportionate to the violation. But we find nothing unreasonable about the deadline or the consequences for failing to meet it. The Bar must establish various deadlines for its applicants. A failure to meet any of these deadlines necessarily precludes an individual from taking the upcoming exam, which may cause an applicant to lose time, effort, money, and job opportunities even though the failure to meet a deadline may be a mere "technical violation." This is not an unexpected notion given that many procedural rules provide harsh penalties for merely technical errors.

¶ 44 Finally, Mr. McBride asserts that the purpose of the Bar favors a more accommodating rule because "imposing an arbitrary deadline with extreme consequences" contradicts the purpose of "advanc[ing] the administration of justice according to law." But one of the many purposes of the Bar is to "regulate the admission of persons seeking to practice law." Utah Sup.Ct. R. Prof'l Practice 14–202(c). In order to properly regulate the admission of Bar applicants, the Bar must necessarily establish deadlines to ensure the efficient administration of the Exam. This often means excluding applicants who fail to meet deadlines. In sum, Mr. McBride fails to clearly demonstrate that he was treated in an unfair, unreasonable, or arbitrary manner.

### CONCLUSION

¶ 45 Although moot, we address the issues raised by Mr. McBride under the public interest exception to the mootness doctrine. We hold that Mr. McBride has not clearly shown that the Bar denied him procedural due process, substantive due process, or equal protection of the laws. Mr. McBride has been afforded significant procedural due process, including seven notices and an exhaustive set of hearings, culminating with an appearance before this court. Mr. McBride's substantive due process claim is similarly unavailing since the Bar's 10:00 p.m. deadline is rationally related to the Bar's legitimate interest in the efficient administration of the Exam. Mr. McBride's equal protection claim fails because the Bar had a rational reason for treating him, and other computer examinees, differently from those examinees who handwrote their answers. These reasons include preventing cheating, ensuring effective exam administration, and keeping down costs. Moreover, Mr. McBride cannot prove that the Bar acted in an unfair, unreasonable, or arbitrary manner. We therefore deny Mr. McBride's petition for relief.

¶ 46 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Justice NEHRING concur with Justice PARRISH's opinion.

¶ 47 Justice WILKINS did not participate herein.