*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 29**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JENNIFER LONG,
*Petitioner,*

*v.*

UTAH STATE BAR,
*Respondent.*

No. 20240737
Heard April 7, 2025
Filed August 7, 2025

On Petition for Review of the Utah State Bar's Decision on
Attorney Applicant Application

Attorneys:

Emily Adams, Freyja Johnson, Bountiful, for petitioner

Maribeth LeHoux, Emily Lee, Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Jennifer Long has taken the bar exam twelve times across three jurisdictions. She has yet to achieve a passing score and now wishes to take the test again. Our rules limit applicants to six attempts unless they can show good cause why they should be permitted to exceed that cap. The Utah State Bar denied Long's request to retake the exam, prompting her to seek review in this Court. We agree that she has failed to demonstrate good cause and deny her relief.

## BACKGROUND

¶2 Long was born without a right hand and has attention deficit hyperactivity disorder (ADHD). With accommodations for ADHD (additional time and an isolated or reduced-distraction room during examinations), she earned a bachelor's degree in 2001 and a Juris Doctor in 2004.

¶3 For a few years following her law school graduation, Long took the bar exam each time it was offered, for a total of nine attempts across three states—Utah, Missouri, and Kansas.

¶4 Long did not receive accommodations for her first six attempts, in Utah and Missouri. She requested accommodations for four of the six. But, for reasons not appearing in the record, Utah and Missouri denied her requests. For the remaining two attempts, Long did not request accommodations, later explaining that prior denials had discouraged her from doing so.

¶5 Long did receive accommodations for her next three attempts, all of which took place in Kansas. The accommodations she received were typical for someone with ADHD: extra time and a distraction-free environment. Long did not request any other accommodations. In fact, she told the Kansas Bar that she did "not need any special accommodations for [her] physical condition."

¶6 Long did not attempt to take the exam again for fifteen years. She then applied to take the July 2023 exam in Utah. The Utah State Bar (the Bar) denied her request, explaining that she had exceeded the six attempts permitted by rule to all applicants. (*Citing* SUP. CT. R. PRO. PRAC. 14-711(f).) The Bar further informed Long that she might be permitted to exceed that cap if she filed a petition showing "good cause" to retake the test.

¶7 Long filed such a petition. In it, she argued, among other things, that she had never previously asked for accommodations for both her ADHD and her physical disability. For the July 2023 exam, she asked for double time, frequent breaks, a separate room, and the ability to handwrite her responses to the essay portion. This mélange of accommodations would, Long believed, provide her with a fair opportunity to succeed on the exam. Long accepted responsibility for her failure to request these accommodations previously, but she maintained that she "should not be denied the opportunity to sit for the bar exam merely because [she] did not have the understanding of [her] disabilities" she had since come to possess.

¶8 The Bar's Admissions Committee granted Long's petition and gave her each accommodation she requested. Long, however, did not pass.

¶9 Long petitioned to take the February 2024 exam with the same accommodations. The Admissions Committee again granted her request, but it "expressed hesitation about granting further requests." Long again did not log a passing score.

¶10 Long next requested permission to sit for the July 2024 exam. In her petition, she explained that she had experienced "significant pain and swelling" in her hand during the February 2024 exam. She now believed that her ability to use her only hand was "deteriorating over time and with overuse" and wished to return to typing the written portions of the test.

¶11 This time, the Admissions Committee denied Long's request. The Committee expressed sympathy for Long's situation but stated that it did not agree that "establishing the need for different accommodation [was] sufficient good cause to grant [Long's] petition," especially since it had granted Long "each accommodation [she] requested" for her previous two attempts.

¶12 Long appealed the Bar's decision. A review panel of the Admissions Committee affirmed the denial of her petition.

¶13 Long next appealed to this court. Before us, she argued that she should receive an additional opportunity to take the exam with accommodations because she would then have had the opportunity to take six accommodated exams. Long contended that since the rules permit every applicant to take the bar examination six times, good cause existed for her request for a sixth accommodated administration.

¶14 After oral argument, this court notified the parties, in an order, that a majority of the court concluded that Long had established good cause to be permitted to take the bar exam for a twelfth, and sixth accommodated, time.

¶15 Later in the day after the order issued, Long's counsel sent the court a letter. That letter recounted that "[u]pon contacting Ms. Long to inform her" of the court's order, Long "informed counsel that she did not pass the Missouri bar exam that she took in February 2025." The letter also noted that Long received accommodations and was permitted to type the essay portion. This was the first time the court learned that Long had already taken the bar for a twelfth time, including a sixth time with accommodations.

Counsel acknowledged that the "number of times that Ms. Long has received accommodated attempts was key to counsel's argument." Counsel predicted, accurately, that "this information may affect the Court's determination about whether Ms. Long has shown good cause to take the Utah Bar again."

¶16 In light of the new information, the court rescinded its order and the instruction that Long be permitted another opportunity to take the bar exam. The court notified the parties that it would reconference on the case.

## ISSUE AND STANDARD OF REVIEW

¶17 Long asks us to review the Admissions Committee's denial of her petition and to permit her to retake the bar exam. The Utah Constitution "empower[s] [us] to govern the practice of law in Utah, including the admission to practice." *Spencer v. Utah State Bar*, 2012 UT 92, ¶ 7, 293 P.3d 360 (cleaned up) (discussing article VIII, section 4 of the Utah Constitution). On review of the Bar's admissions decisions, we have "generally chosen to indulge some deference to [its] findings and judgments." *Id.* (cleaned up). But because the ultimate responsibility to oversee the practice of law is ours, we retain discretion to "exercise judgment independent of the Bar whenever we deem it appropriate." *Id.* (cleaned up). Below, we clarify this standard of review and explain why we choose to exercise our own judgment in this case.

## ANALYSIS

¶18 In briefing and at oral argument, Long advanced several reasons why she should be permitted to retake the bar exam. By her own description, her "key" argument was that she should be afforded six accommodated attempts to "put her on an even playing field with other applicants." She also argued that her disabilities and her understanding of the accommodations her disabilities require largely fall outside of her control.

¶19 Although Long's primary argument was not without merit when made, it fails when we take into account Long's most recent attempt to pass the bar exam. In resting our decision on that attempt, which postdated the Bar's petition and appeals process, our analysis stands on grounds independent of the Bar's. To explain the reason for that departure, we first review and clarify the applicable standard of review. We then turn to Long's arguments.

¶20   As we survey our jurisprudence, it becomes apparent that we have been less than clear about the standard of review that applies to  appeals such as Long's. We have established that we do not owe the Bar's findings or judgments deference as a matter of obligation or constitutional structure—as we might owe those of an administrative agency or trial court. *See In re Admission of Thorne*, 635 P.2d 22, 23 (Utah 1981) (per curiam). This anchors our repeated pronouncement that "we may exercise judgment independent of the Bar whenever we deem it appropriate." *See Spencer v. Utah State Bar*, 2012 UT 92, ¶ 7, 293 P.3d 360 (cleaned up); *see also McBride v. Utah State Bar*, 2010 UT 60, ¶ 12, 242 P.3d 769; *In re Arnovick*, 2002 UT 71, ¶ 5, 52 P.3d 1246.

¶21   And yet we have also stated that we "generally" choose to "indulge some deference to the Bar's findings and judgments." *See Spencer*, 2012 UT 92, ¶ 7 (cleaned up); *McBride*, 2010 UT 60, ¶ 12 (cleaned up); *see also In re Arnovick*, 2002 UT 71, ¶ 5. We often recite these two declarations side by side, without elaborating the circumstances under which we will choose to exercise our independent judgment and those under which we will choose to defer. *See Spencer*, 2012 UT 92, ¶ 7; *see also McBride*, 2010 UT 60, ¶ 12. This case does not require us to discuss every single type of appeal that might arise from a decision the Bar makes using the authority we have delegated to it. But we lay out a few general principles to explain why we choose to exercise judgment independent of the Bar's in this case.

¶22   Our present iteration of the standard of review for appeals of Bar decisions dates back to a 1981 case, *In re Thorne*, 635 P.2d 22. In that case, we were asked to admit Thorne to practice because of irregularities in the administration of the bar exam, which he argued had caused him to fail. *See id.* at 22–24. Thorne asked this court to re-grade his test responses. *Id.* We, not surprisingly, did not jump at the chance.[1] *See id.* at 23.

¶23   We first noted that the Bar functions "in a sense as an arm of the Court." *Id.* The Bar acts with delegated authority to carry out our constitutional responsibility to "govern the practice of law,

---

[1] It feels appropriate to publicly declare our immense gratitude to the volunteers who take time out of their busy lives and practices to grade the bar exam. We are often amazed at the willingness of so many to dedicate their time and energy to the betterment of our profession, and we are never ungrateful.

including admission to practice law." UTAH CONST. art. VIII, § 4. Because the authority the Bar exercises is ultimately our own, our review of its judgments "is not necessarily on exactly the same footing as the review of a judgment of a trial court, nor an administrative agency," and we "exercise [our] judgment independent of that of the Bar" when we deem it appropriate. *In re Thorne*, 635 P.2d at 23. Nevertheless, we choose to "repose some confidence and trust in [the Bar's] actions by indulging some deference to its findings and judgments." *Id.*

¶24 We offered two reasons why we should afford the Bar some deference. *See id.* We first explained that it is "neither practical nor desirable for this Court to devote its time and energies in the re-grading of examination papers." *Id.* This reason was somewhat particular to *Thorne*'s facts. But, stated at a higher level of abstraction, it retains a broader relevance: some decisions we ask the Bar to make require application of specialized knowledge to a high volume of material. Those tasks, especially at scale, are not particularly suited to this court's de novo review. We next explained that we deputized the Bar for good reason—because we trust that it will capably carry out the responsibilities assigned to it. *See id.*

¶25 With these principles in mind, *Thorne* announced a standard of review for "controversies *such as that involved here*": "the Court should not disturb what the [Bar] has done unless the petitioner clearly demonstrates that he has been treated in an unfair, unreasonable or arbitrary manner." *Id.* (emphasis added). We repeated this standard in subsequent cases without explaining why they came close enough to *Thorne*'s facts to warrant application of *Thorne*'s standard. *See, e.g., Spencer*, 2012 UT 92, ¶ 7; *McBride*, 2010 UT 60, ¶ 12.

¶26 *In re Arnovick* extended the *Thorne* standard to "the actions of the Bar and the Bar examination process" generally. 2002 UT 71, ¶ 5. Taken at face value, this language would remove any room for us to exercise our independent judgment, rendering nugatory the constitutional principles *Thorne* described. But because *Arnovick* itself invoked these constitutional principles and dealt with a similar scenario to *Thorne*'s (a fact-intensive challenge to a specific exam administration), we assume it did not mean to subject *all* "actions of the Bar" to this deferential standard of review. *See id.* ¶¶ 2, 5–6. Instead, we read *Arnovick* to have left open the possibility that the *Thorne* standard does not always apply to the review of Bar decisions. The *Thorne* standard is best thought of as "a general

proposition," from which we "reserve the right" to depart where circumstances warrant. *Cf. In re Knowlton*, 800 P.2d 806, 808 (Utah 1990) (characterizing an older standard of review for attorney discipline cases).

¶27  This case presents a scenario where it serves no purpose to defer to the Bar's reasoning: a material event has intervened between the Bar's process and the decision of this court. This is the sort of case where our unique structural relationship to the Bar enables us to take note of evidence that might escape analysis or require a remand to a lower body in another context. When we hear an appeal from a district court, our review is generally limited to the record of proceedings before that body. *See Montes v. Nat'l Buick GMC, Inc.*, 2024 UT 42, ¶ 39 n.8, 562 P.3d 688 ("We do not consider documents that fall outside the appellate record, no matter how much they might pique our interest."). But Bar proceedings do not necessarily demand the same treatment.

¶28  Long's dilatorily disclosed February 2025 attempt at the Missouri exam changed our view of this case. Before we learned of it, a majority of the court granted Long's petition because we agreed that she deserved six accommodated attempts to be put on the same playing field as applicants without disabilities. But Long has been afforded a sixth accommodated opportunity. This eliminates the factual premise of her primary argument before us and robs it of the persuasive value it once had.

¶29  Long's remaining argument is equally unpersuasive in light of the new Missouri attempt. We are genuinely sympathetic to the challenges Long faces when taking the bar exam and her evolving understanding of the accommodations that might assist her. But we must note that Long has received precisely the accommodations she requested for each of her six accommodated attempts. Indeed, Missouri granted Long the specific change in accommodations Long requested of our Bar—a return to typed exams. We admire Long's tenacity, but we cannot conclude, on the briefing before us, that she has demonstrated the good cause our rule requires to again retake the exam.

## CONCLUSION

¶30  Long argues that she has shown good cause to exceed our limit of six attempts at the bar exam. In light of developments subsequent to the Bar's decision, we affirm its denial of Long's petition.